IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

|  |  |
|---|---|
| MARYLOU KOHLER, | CASE NO. 1:22-cv-1043 |
| Plaintiff, | DISTRICT JUDGE JOHN R. ADAMS |
| vs. |  |
| COMMISSIONER OF SOCIAL SECURITY, | MAGISTRATE JUDGE JAMES E. GRIMES JR. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Marylou Kohler filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying Supplemental Security Income. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). This matter has been referred to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend that the District Court affirm the Commissioner's decision.

**Procedural history**

In November 2018, Kohler filed applications for Supplemental Security Income and Disability Insurance Benefits alleging a disability onset date of December 4, 2017,[1] and claiming she was disabled due to neck and spine

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

issues, bulging discs, spine osteoarthritis, asthma, GERD (gastroesophageal reflux disease without esophagitis), traumatic brain injuries, muscle hypertonicity, carpal tunnel syndrome, osteoporosis, severe diverticulitis, vertigo, lower back pain with radiculopathy, and right knee issues. Tr. 331, 338, 383. The Social Security Administration denied Kohler's application and her motion for reconsideration. Tr. 107–08, 161–62. Kohler then requested a hearing before an Administrative Law Judge (ALJ). Tr. 217.

In December 2019, an ALJ held a hearing, Tr. 79–106, and the next month issued a written decision finding that Kohler was not disabled, Tr. 163–75. Kohler appealed, and in October 2020 the Social Security Appeals Council remanded the case back to the ALJ. Tr. 181–83.

In January 2021, the ALJ held a second hearing.[2] Tr. 29–78. The next month, the ALJ issued a written decision finding that Kohler was not disabled. Tr. 10–22. The ALJ's decision became final on April 19, 2022, when the Social Security Appeals Council declined further review. Tr. 1-3; *see* 20 C.F.R. § 404.981.

In her Complaint filed in June 2022, Kohler asserts the following assignments of error:

> 1.  The ALJ erred when she failed to find at Step Three of the Sequential Evaluation that Kohler satisfied the criteria of Listing 5.06.

---

[2]    At this hearing, Kohler withdrew her Disability Insurance Benefits application. Tr. 33.

2.  The ALJ committed harmful error at Step Four of the Sequential Evaluation when she found that Kohler could perform her past work as a credit authorizer.

3. The ALJ erred in her credibility finding when she failed to consider Kohler's symptoms as required by Social Security Ruling 16-3p.

Doc. 9, at 1.

**Evidence**

*1.    Personal and vocational evidence*

Kohler was born in 1964 and was 61 years old on her alleged disability onset date. Tr. 338. She attended two years of college. Tr. 84. Kohler last worked as a pizza delivery driver in 2017. Tr. 85–86. Before that, she worked for a department store as a credit authorization representative. Tr. 87.

*2.    Medical evidence[3]*

In August 2016, Kohler had a right knee MRI, which showed "increasingly conspicuous degenerative disease along the vertical ridge of the patella." Tr. 761. In March 2017, a lumbar MRI showed that Kohler had multilevel degenerative disease and disc bulging, mostly at L4/5 and L5/S1, without disc herniation.[4] Tr. 760. There was moderate spinal canal stenosis at L4/5 and mild spinal canal stenosis at L5/S1. Tr. 760.

---

[3]    The recitation of medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

[4]    Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated    as    C1    through    C7.    *See*    https://www.spine-

In October 2017, Kohler followed up with her orthopedic doctor for chronic right knee pain with "minimal patellofemoral and medial arthritis." Tr. 636. X-rays taken that day showed "very subtle narrowing in the medial compartment" and "some component of spurring along the lateral facet of the patella." Tr. 637.

In November 2017, Kohler followed up with her doctor for neck pain radiating to her left shoulder and arm. Tr. 902. The doctor reviewed an undated MRI, which showed spondylosis and left-sided foraminal stenosis at C3/4 and a surgical fusion at C4/5. Tr. 903. The doctor recommended cervical epidural injections. Tr. 903.

In December 2017, Kohler told her orthopedic doctor that she had severe lower back pain radiating to her legs. Tr. 639. The doctor assessed lower back pain and radiculopathy. Tr. 640.

In February 2018, Kohler saw a physician's assistant for left shoulder instability. Tr. 905. The provider assessed Kohler with recurrent shoulder dislocation. Tr. 906.

In February and March 2018, Kohler had cervical spine epidural block injections. Tr. 907.

---

health.com/conditions/spine-anatomy/vertebrae-vertebral-column (last visited April 17, 2023). The twelve vertebrae compromising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The five in the lower spine— the lumbar spine— are L1 through L5. *Id*. And the five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region (last visited April 17, 2023).

In April 2018, Kohler saw her orthopedic doctor for a follow-up for lower back pain. Tr. 642. Kohler said that she was "doing relatively well," but still had radiating lower back pain. Tr. 642. An x-ray showed "a slight anterolisthesis of L4 on L5." Tr. 643.

In June 2018, Kohler had an EMG for her complaints of back pain and leg pain and numbness. Tr. 956. The EMG showed an "[e]ssentially normal" study, but "a multiradicular pattern which usually points towards a lumbar pathology" was observed. Tr. 956.

In July 2018, Kohler's doctor observed that Kohler used a cane to ambulate for "ongoing imbalance." Tr. 645, 926. Kohler also reported headaches two to three times a week, which improved after her cervical spine injections. Tr. 926.

In early September 2018, Kohler was evaluated for "long-standing GERD in association with chronic constipation and intermittent nausea and vomiting." Tr. 929. Kohler's exam findings were normal. Tr. 931. The doctor diagnosed GERD without esophagitis, nausea and vomiting, and chronic constipation. Tr. 932. The doctor advised that "MiraLAX would be likely an optimal choice for her" and ordered a colonoscopy. Tr. 932. The colonoscopy showed diverticulosis, severe in the sigmoid colon and mild in the transverse colon, and polyps, which were removed. Tr. 1337–38.

Also in September, Kohler followed up for myofascial pain, cervical spondylosis, cervicalgia, and a history of cervical fusion. Tr. 933. Kohler

reported "100% pain relief from [c]ervical [f]acet injection and still ongoing." Tr. 933. She was finishing physical therapy for her neck and was doing well. Tr. 933. Kohler said that she increased her activity level and was "trying to accomplish house projects." Tr. 933. Upon exam, Kohler had a slightly limited neck range of motion in all directions. Tr. 935. She had tenderness in her trapezius muscles and four-out-of-five strength. Tr. 935. The doctor recommended a second cervical injection and prescribed Naprosyn. Tr. 936, 1082. In October, Kohler received a cervical epidural block injection. Tr. 1081.

Also in October 2018, Kohler saw her orthopedic doctor for a follow-up for right knee pain. Tr. 674. Kohler reported that both of her knees were "getting worse" and she had difficulty walking and using stairs. Tr. 674. She used a cane. Tr. 674. The doctor assessed Kohler with transient synovitis of her knees with mild osteoarthritis and administered cortisone injections. Tr. 676, 1492.

In early November 2018, Kohler saw her orthopedic doctor and reported that her back pain was about the same, "act[ing] up after she d[id] some housework or … some yard work." Tr. 648. Later that month, Kohler had a follow-up appointment for her cervical radiculopathy. Tr. 1516. Kohler said that she couldn't take Naproxen because she had a stomach ulcer and a gastrointestinal work-up. Tr. 1516. She reported 85% pain relief from her last cervical block injection. Tr. 1517. Kohler's exam findings were the same as her last visit. Tr. 1517–18. The physician's assistant recommended that Kohler

6

continue to wear her left wrist brace for carpal tunnel syndrome and continue her home exercise regimen. Tr. 1518. Kohler "desire[d] to hold off" on recommended topical analgesics and would call the office if she needed another injection for her cervical radiculopathy symptoms. Tr. 1518.

In December 2018, Kohler had a three-month follow-up visit for her GERD and stated that she was "doing okay." Tr. 2388. She reported a sharp pain in her upper chest. Tr. 2392. Her exam findings were normal. Tr. 2393. Kohler was diagnosed with GERD and pleurisy and prescribed a Medrol dose pack, magnesium-oxide, and a nasal spray. Tr. 2393–94.

In early January 2019, Kohler followed up for her knee pain, which she rated, at worst, a six out of ten. Tr. 1492. She used a cane for long walks. Tr. 1492. Upon exam, Kohler was in mild distress, with "+1 synovitis" in her right knee and trace synovitis in her left knee. Tr. 1493. She had full range of motion with pain upon deep flexion. Tr. 1493. Kohler had general laxity in both knees. Tr. 1493. X-rays showed "very minimal narrowing" in the medial compartments of her knees. Tr. 1493. For her knees, Kohler received corticosteroid injections due to her "good response" to injections in the past, and she was referred to a rheumatologist for a long-term treatment evaluation. Tr. 1493–94.

In February 2019, Kohler had a pre-esophagogastroduodenoscopy exam. Tr. 1509, 1513. Kohler's medications were listed as: Cymbalta for headaches; Albuterol for asthma; Norco and Gabapentin for chronic neck and back pain;

Protonix for GERD; and compression stockings and hydrochlorothiazide for chronic leg edema. Tr. 1512.

In March 2019, Kohler saw a rheumatologist for pain in her knees, feet, and shoulder. Tr. 1598, 1600. Kohler's exam findings showed shoulder tenderness and limited range of motion, worse on the left. Tr. 1599. Kohler had right wrist tenderness with a restricted range of motion, tenderness and a slightly limited range of motion in her hips, and tenderness in her toe joints. Tr. 1560. Her spine range of motion was normal. Tr. 1599. Kohler was assessed with inflammatory arthritis, spondylosis of lumbar region without myelopathy or radiculopathy, and inflammatory back pain. Tr. 1598. The doctor prescribed an anti-rheumatic medication and a 60-day Prednisone taper. Tr. 1598.

In early April 2019, Kohler saw her orthopedic doctor and reported that she had "been doing relatively well" since her last visit in November 2018. Tr. 1573. Kohler's exam findings showed that Kohler was in mild to moderate discomfort, walked with an antalgic gait, and used a cane. Tr. 1574. The doctor refilled Kohler's Norco prescription. Tr. 1574.

Later that month, Kohler reported that the injection helped her right knee more than her left. Tr. 1576. Upon exam, Kohler was in moderate distress. Tr. 1577. She had tenderness along the medical joint line of her left knee but could move that knee "from -2 degrees of extension to 100 degrees of flexion" Tr. 1577–78. Her right knee range of motion was "from -2 degrees of extension to 95 degrees of flexion" and limited further due to pain. Tr. 1577–

8

78. Kohler had a positive McMurray's sign, which indicates meniscus involvement. Tr. 1588. Kohler's symptoms were attributed to Kohler hyperextending her right knee two months before the visit—"this is distinctly different from prior presentation." Tr. 1578. Kohler received knee injections and a right knee MRI was ordered. Tr. 1578. The MRI showed a minimal tear in "the undersurface of the middle third of the lateral meniscus" and mild degenerative disease of the patella. Tr. 1586.

In mid-May 2019, Kohler followed up with her orthopedic doctor after her knee MRI. Tr. 1580. Kohler's exam findings were similar to the prior visit, except Kohler was in mild distress and her right knee range of motion improved to 105 degrees of flexion. Tr. 1581. The doctor continued Kohler on "conservative management" of her right knee and gave Kohler a new right knee brace. Tr. 1582.

Later in May 2019, Kohler followed-up with her rheumatologist. Tr. 1595. Kohler had "impr[]essive" improvement with her medications and had "low to moderate residual disease activity." Tr. 1595. Kohler's exam findings showed tenderness in Kohler's finger and toe joints and Kohler's trochanteric bursa. Tr. 1596. The doctor added folic acid and methotrexate to Kohler's medications. Tr. 1595.

The next day, Kohler followed-up for her cervical radiculopathy. Tr. 1916. She reported that her October 2018 injection provided relief until March 2019 and that it was 80% effective. Tr. 1916. Upon exam, Kohler's neck was

9

tender with a restricted range of motion and Kohler's upper extremity strength was slightly reduced, at four out of five. Tr. 1918. Kohler had some difficulty standing up from a seated position because of her knee pain and she used a cane. Tr. 1918. The doctor prescribed a Medrol dose pack, a muscle relaxant, and, if Kohler's pain persisted, another injection in five to six weeks. Tr. 1918. In July, the doctor administered a cervical epidural block injection. Tr. 1936.

Meanwhile, in June 2019, Kohler had an appointment with her primary care doctor for her asthma and denied any respiratory, gastrointestinal, or musculoskeletal problems. Tr. 2406. Her exam findings were normal. Tr. 2407.

In late July 2019, Kohler was hospitalized for five days for an intramural abscess of her sigmoid colon from diverticulitis. Tr. 1991–92, 1733. Kohler was treated with intravenous fluids, antibiotics, and morphine. Tr. 1991. She was discharged with antibiotics. Tr. 1733.

In early August 2019, Kohler followed up with her primary care doctor. Tr. 2421, 2425. Kohler's exam findings were normal except that Kohler had leg edema, which her doctor treated with potassium chloride and a diuretic. Tr. 2426, 2436.

In mid-August 2019, Kohler saw her orthopedic doctor and was in mild to moderate distress. Tr. 1584. She reported lower back pain and she had an antalgic gait. Tr. 1584. The doctor administered an epidural steroid injection in Kohler's right gluteus medius muscle. Tr. 1584. Five days later, Kohler saw her rheumatologist and had "no complaints." Tr. 1591. Kohler's exam findings

were normal. Tr. 1593–94. The doctor modified Kohler's diagnoses to spondylosis of the lumbar region without myelopathy or radiculopathy, high-risk medication use, seronegative rheumatoid arthritis, and osteoporosis. Tr. 1591.

In September 2019, an abdominal CT scan showed that Kohler's abscess had resolved, but Kohler had "mild residual wall thickening with mucosal hyperenhancement of the sigmoid colon." Tr. 2142. Kohler's doctor recommended an elective sigmoid colon resection to avoid a recurrence and a follow-up colonoscopy. Tr. 1756. The colonoscopy showed a stricture. Tr. 2142.

Also in September 2019, Kohler returned to her rheumatologist and reported that her pain was "much better controlled." Tr. 1588. The doctor wrote that Kohler's rheumatoid arthritis was "in low to moderate disease activity." Tr. 1588. The doctor's exam findings showed that Kohler had tenderness in her left ankle and in multiple fingers but no other abnormalities. Tr. 1589. The next month, Kohler's rheumatoid arthritis was described as stable on her medication regimen. Tr. 2119.

In late October 2019, Kohler was hospitalized for three days while she underwent a laparoscopic sigmoid colectomy. Tr. 2163. When she was discharged, she was assigned temporary lifting restrictions of less than 20 pounds for two weeks and then less than 40 pounds for the four weeks after that. Tr. 1871.

11

In early November 2019, Kohler followed up with her primary care doctor and denied any symptoms, including all gastrointestinal and musculoskeletal symptoms. Tr. 2440, 2445. Her physical exam findings were normal. Tr. 2446.

About a week later, Kohler had her first post-surgical visit. Tr. 2511. Her incisions appeared to be well-healed and she was "doing well." Tr. 2511. Kohler requested that the surgeon complete a form about "any GI disabilities that she has" and the surgeon wrote:

> The patient was advised however that this procedure she currently had was to avoid her having any type of associated GI disability from the diverticulitis. We were successful in avoiding major problems as a result of abscesses, infections, strictures and the possibility of bowel obstructions. At least from my surgery standpoint, we don't anticipate any type of long-term disabilities.

Tr. 2512.

About five days later, when seeking care for a urinary tract infection, Kohler reported experiencing abdominal pain and denied any musculoskeletal symptoms. Tr. 2801.

In December 2019, Kohler saw her orthopedic doctor and reported that she had "a little aggravation" of lower back pain "but [wa]s otherwise doing well." Tr. 2480. Upon exam, Kohler was in moderate discomfort with an antalgic gait. Tr. 2481. The doctor refilled Kohler's hydrocodone prescription. Tr. 2481. About two weeks later, Kohler saw her primary care doctor and

denied any gastrointestinal or musculoskeletal symptoms. Tr. 2816, 2821–22. Kohler's physical exam was normal. Tr. 2822.

In early January 2020, Kohler had a three-month follow-up with her rheumatologist. Tr. 2477. The doctor wrote that Kohler's rheumatoid arthritis was "much better controlled with Plaquenil and methotrexate" and that Kohler had "[w]orsening knee pain, likely due to osteoarthritis." Tr. 2377. Upon exam, Kohler had knee crepitus and joint line tenderness in both knees. Tr. 2478. The doctor ordered knee x-rays and sought approval for gel injections. Tr. 2477.

In April 2020, Kohler saw her rheumatologist for her first knee gel injections. Tr. 2473. Kohler reported that she had morning stiffness for one to two hours. Tr. 2427. She had some pain and stiffness in her hands, "however the functionality is much better." Tr. 2427. She also had increased pain and swelling in her feet. Tr. 2472. The doctor's exam findings showed that Kohler had four out of five hand grip strength with tenderness in multiple finger joints, joint line tenderness in her knees, and significant synovitis in the toe joints of both feet. Tr. 2475–76. Kohler received knee injections. Tr. 2472.

In June 2020, Kohler told her orthopedic doctor that she was having bouts of discomfort due to rheumatoid arthritis but was otherwise "doing relatively well." Tr. 2483. Kohler was in mild to moderate discomfort upon exam and had an antalgic gait. Tr. 2484. Kohler's medication was continued. Tr. 2484. Two weeks later, Kohler saw her primary care doctor for a routine check-up. Tr. 2835. Kohler's exam showed normal findings. Tr. 2841–42.

In early August 2020, Kohler saw her rheumatologist. Tr. 2469. Upon exam, Kohler had a limited range of motion in her cervical spine, trapezius muscle tenderness, knee joint line tenderness, and improved hand synovitis. Tr. 2469. The doctor wrote that Kohler's "rheumatoid arthritis is better controlled with triple therapy." Tr. 2465. Kohler said that she believed a new medication "helped significantly" since her last visit. Tr. 2466. Later that month, Kohler had a cervical epidural block injection. Tr. 2674.

In September 2020, Kohler said she had to "constantly" go "up and down stairs" because her bathroom was not on the main floor. Tr. 2723. One week later, Kohler reported an 80% percent improvement in neck pain after her cervical injection. Tr. 2735. Kohler's exam findings showed a limited range of motion in Kohler's cervical and lumbar spine and tenderness in Kohler's neck. Tr. 2735. The evaluating wrote that Kohler "showed very low effort" on exam testing. Tr. 2735.

In October 2020, Kohler had a one-year follow-up for her GERD. Tr. 2740. Kohler told her doctor that she ran out of her long-used Protonix and, as a result, had a recurrence of her symptoms. Tr. 2740. The doctor wrote, "[w]hile on the Protonix, she is asymptomatic." Tr. 2740. Kohler also wasn't taking her other recommended medications. Tr. 2740. The doctor restarted Kohler on Protonix. Tr. 2744. Three days later, Kohler saw her rheumatologist. Tr. 2459. Her arthritis was "fairly stable on triple therapy" and she was advised to return for gel injections in her knees when her pain worsened. Tr. 2459.

Kohler's hand synovitis was improved, and she had tenderness in the joint line in her knees. Tr. 2463. The doctor wrote, "At today's visit the patient is doing well. She continues to feel better in regards to her arthritis." Tr. 2460.

In early November 2020, Kohler saw her orthopedic doctor and said that she had "been doing quite well" but was having trouble rising from a seated position. Tr. 2487. She reported pain, rated ten out of ten, in her lower back, left hip, and left leg. Tr. 2486. Lumbar spine x-rays showed moderate degenerative space narrowing at L1/2—L4/5, with mild disc degeneration at L5/S1 and osteoarthritis of both hips. Tr. 2487. Upon exam, Kohler was in mild to moderate discomfort and had an antalgic gait. Tr. 2487. The doctor advised Kohler to continue her home exercise regimen and take hydrocodone as needed. Tr. 2487.

In December 2020, Kohler said that her neck pain was "much better" and she experienced 80% pain relief from her August injection. Tr. 2757. Kohler's exam findings showed that Kohler had tenderness and a positive Spurling's test.[5] Tr. 2756–57. Later that month, Kohler saw her primary care doctor for a follow-up appointment and denied any gastrointestinal or musculoskeletal symptoms. Tr. 2856, 2861. The doctor's exam showed normal findings. Tr. 2862.

---

[5]    A positive Spurling's test indicates radiculopathy. *See* Dorland's Illustrated Medical Dictionary, at 1900 (32d ed. 2012).

In January 2021, Kohler went to the doctor's office complaining of left foot and ankle swelling and pain that began the day before. Tr. 2878. Kohler's exam findings showed swelling, tenderness, and reduced range of motion in Kohler's left ankle and foot. Tr. 2882. The doctor prescribed Naprosyn and ordered x-rays. Tr. 2883–84.

### 3.    *State agency opinions*[6]

In January 2019, William Bolz, M.D., reviewed Kohler's record and assessed Kohler's residual functional capacity (RFC).[7] Dr. Bolz found that Kohler could lift and carry 20 pounds occasionally and 10 pounds frequently, stand and walk for six hours in a workday, and sit for six hours in a workday. Tr. 118–19. Dr. Bolz also assessed postural limitations. Tr. 119.

In April 2019, Sreenivas Venkatachala, M.D., reviewed Kohler's record and adopted Dr. Bolz's findings, except Dr. Venkatachala found that Kohler

---

[6]    When a claimant applies for disability benefits, the State Agency creates a record. The record includes the claimant's medical evidence. A State Agency disability examiner and a State Agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the State Agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the State Agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

[7]    An RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (quoting 20 C.F.R. § 416.945). Essentially, it's the SSA's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

could stand and walk only four hours during a workday and had environmental restrictions. Tr. 143–45.

4.    *Hearing testimony*

Kohler, who was represented by counsel, testified at both administrative hearings.

*December 2019 hearing.* Kohler testified that she lived alone in a house. Tr. 84. There were "too many steps" in her house to climb. Tr. 84. Kohler had a driver's license but didn't drive because she didn't have a car. Tr. 84–85.

When asked why she stopped working in 2017, Kohler stated that she developed headaches and that she "was still going back and forth to the doctor." Tr. 88. When asked why she couldn't work at the time of the hearing in 2019, Kohler said that she had surgery for diverticulitis two months before the hearing. 89. Kohler also stated that she wore braces on her knees and wrists and had rheumatoid arthritis in her feet. Tr. 90. She had back and neck problems. Tr. 90.

Kohler stated that she didn't keep up with her household chores or yardwork. Tr. 90. She "can't move half the furniture anyways." Tr. 91. Friends take her grocery shopping. Tr. 91. She prepares easy meals. Tr. 91. She does laundry, which involves navigating stairs. Tr. 91. On a typical day, Kohler stays home, washes some dishes, does a "little bit" of laundry, and a "very little bit of vacuuming." Tr. 92. She reads books "a little bit" and watches "very little" television. Tr. 92.

Kohler stated that she has problems using her hands. Tr. 93. When she worked as a credit authorizer, she had to type "most of the day" and she sat for six or more hours. Tr. 87–88, 93.

*January 2021 telephonic hearing*. Kohler testified that she still lived alone in a two-story house with a basement. Tr. 37. Kohler's bedroom is upstairs, and the laundry room is in the basement. Tr. 37–38.

Kohler described her job as a credit authorizer as "some sitting and some standing." Tr. 46. She typed "a lot …. Not all the time but most of the time." Tr. 46.

When asked how her conditions changed since the 2019 hearing, Kohler stated that her wrists and fingers hurt. Tr. 48. She can't move her wrist. Tr. 48. She was "in an air cast in one, a knee brace in the other." Tr. 48. Kohler stated that her spine hurt all the time and that she was told to stay off her foot. Tr. 48. Her hips hurt. Tr. 49. When asked how she took care of herself, Kohler stated that "[s]omebody helps [her]. Sometimes they come over." Tr. 49. Someone takes Kohler shopping and carries things for her. Tr. 49. A friend does Kohler's laundry because Kohler has trouble walking downstairs wearing a cast. Tr. 49–50. Kohler can make "a sandwich or two." Tr. 49. A friend helps Kohler with household chores. Tr. 50. Kohler can't lift a chair or "anything like that." Tr. 50. "[A]t the moment," she can wash a "little bit" of dishes. Tr. 50.

On a typical day, Kohler wakes up, goes downstairs, and makes breakfast. Tr. 51. Then she goes back upstairs, props her leg up, and "maybe"

18

reads. Tr. 51. Later, she goes downstairs to make something to eat—"[t]hat's all [she's] allowed to do." Tr. 52. Kohler uses a single-point or four-prong cane in the house. Tr. 53.

When asked if there were times as a credit authorizer that she had to sit for the entire eight-hour workday other than breaks, Kohler answered yes. Tr. 54.

The ALJ discussed with the vocational expert Kohler's past relevant work as a food deliverer and credit authorizer. Tr. 57. The ALJ asked the vocational expert to determine whether a hypothetical individual with the same age, education, and work experience as Kohler could perform Kohler's past work if the individual had the limitations assessed in the ALJ's RFC determination, described below. Tr. 57–58. The vocational expert answered that such an individual could perform Kohler's past work as a credit authorizer as Kohler performed it and as generally performed. Tr. 58. Kohler's attorney asked the vocational expert questions about whether the credit authorizer job required eight hours of sitting rather than six. Tr. 59–73. The vocational expert stated that the credit authorizer job as generally performed could be performed by a person sitting for no more than six hours. Tr. 60–62, 66, 72–73.

**The ALJ's Decision**

The ALJ made the following findings of fact and conclusions of law:

> 1. The claimant has not engaged in substantial gainful activity since October 17, 2018, the application date (20 CFR 416.971 *et seq*.).

2.  The claimant has the following severe impairments: osteoarthrosis and allied disorders and degenerative disc disease (20 CFR 416.920(c)).

3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform less than the full range of light work as defined in 20 CFR 416.967(b). Specifically, the claimant can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for four hours out of an eight-hour workday and sit for six hours out of an eight-hour workday. Further, the claimant can frequently climb ramps or stairs. She can never climb ladders, ropes, and scaffolds. Additionally, the claimant can frequently balance and stoop. She can occasionally kneel, crouch, and crawl. She should never be exposed to hazards, such as unprotected heights and dangerous machinery. Finally, the claimant needs a cane to ambulate.

5.  The claimant is capable of performing past relevant work as a credit authorizer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 416.965).

6.  The claimant has not been under a disability, as defined in the Social Security Act, since October 17, 2018, the date the application was filed (20 CFR 416.920(f)).

Tr. 16–22.

**Standard for Disability**

Eligibility for social security benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1.  Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2.  Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3.  Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

4.  What is the claimant's residual functional capacity and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5.  Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work

> experience? If so, the claimant is not disabled.
> If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 416.920. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

**Standard of review**

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters*, 127 F.3d at 528. "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting 42 U.S.C. § 405(g)).

A court may not try the case de novo, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir.

1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

**Discussion**

*1.    The ALJ did not err at step three*

Kohler argues that the ALJ erred by failing to find that Kohler satisfied the requirements for Listing 5.06A, *Inflammatory bowel disease*.[8] Doc. 9, at 9–10. To satisfy Listing 5.06A, a claimant must show an inflammatory bowel disease:

> documented by endoscopy, biopsy, appropriate medically acceptable imaging, or operative findings with:
>
> A. Obstruction of stenotic areas (not adhesions) in the small intestine or colon with proximal dilatation, confirmed by appropriate medically acceptable imaging or in surgery, requiring hospitalization for intestinal decompression or for surgery, and

---

[8]    The "listings" are found at 20 C.F.R Part 404, Subpart P, App. 1. They are a catalog of disabling impairments organized by "body systems." Generally, each body system section has an Introduction, which contains information relevant to that system, and a Category of Impairments, which contains each numbered listing. Each listing describes the objective medical and other findings needed to satisfy the criteria of that listing. *Id.*; 20 C.F.R. § 404.1525.

> occurring on at least two occasions at least 60 days
> apart within a consecutive 6–month period.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 5.06A.

As an initial matter, the ALJ found that Kohler's gastrointestinal disorders were "not severe" at step two. Tr. 16. Kohler doesn't challenge that finding. And Kohler doesn't cite legal authority requiring an ALJ to consider whether an impairment found *not severe* at step two satisfies a listing at step three. Legal authority indicates otherwise. *See Robinson v. Comm'r of Soc. Sec.*, No. 13-CV-11637, 2014 WL 3528434, at *13 (E.D. Mich. July 16, 2014) (collecting cases); *see also Williamson v. Sec'y of Health & Hum. Servs.*, 796 F.2d 146, 151 (6th Cir. 1986) ("[A]ny impairment that meets the criteria in the Listing of Impairments can hardly be classed as non-severe"); *Cummins v. Comm'r of Soc. Sec.*, No. 5:21-cv-706, 2022 WL 1120468, at *6 (N.D. Ohio Apr. 14, 2022).

Moreover, Kohler doesn't show that there is a substantial question about whether she satisfies Listing 5.06A.[9] *See Sheeks v. Comm'r of Soc. Sec. Admin.*, 544 F. App'x 639, 642 (6th Cir. 2013) (to show that an ALJ committed reversible error at step three, a claimant must show that there is "a substantial question about whether a claimant meets a listing."). Listing 5.06A requires that the claimant have a documented obstruction of the small intestine or

---

[9]    In fact, Kohler's attorney didn't mention Kohler's gastrointestinal issues when he listed Kohler's impairments at the hearings. Tr. 34–36, 82–83.

colon, 20 C.F.R. § Pt. 404, Subpt. P, App. 1, which Kohler did not have. So the ALJ didn't commit reversible error when she didn't discuss Listing 5.06A. *See Sheeks*, 544 F. App'x at 642.

 2. *The ALJ did not err at step four*

Kohler argues that the ALJ erred when she found that Kohler could perform her past work as a credit authorizer. Doc. 9, at 10. Kohler asserts that she testified that, while working as a credit authorizer, she at times sat for her entire eight-hour shift. *Id.*, at 13. Because the ALJ's RFC and hypothetical question to the vocational expert described a person who could sit only six hours in an eight-hour workday, Kohler submits, the ALJ's finding at step four is not supported by substantial evidence.[10] *Id.* at 14.

Even if Kohler performed her past work as a credit authorizer at times sitting for eight hours a day, the ALJ found that, "per the vocational expert's testimony," Kohler could perform the credit authorizer job as Kohler actually performed it *and* "as generally performed." Tr. 21. And contrary to Kohler's assertion, the vocational expert testified that a person limited to sitting for six

---

[10] In this section challenging the ALJ's step four finding, Kohler recites medical evidence, Doc. 9, at 10–13, and concludes, without any explanation: "As set forth above, the medical evidence in this matter documented impairments beyond those listed by the ALJ[,]" *id.*, at 13. To the extent Kohler intends to challenge the ALJ's RFC findings, her challenge is waived. *See McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (internal citations omitted).

25

hours in an eight-hour workday could perform the credit authorizer job as it was generally performed. Tr. 60–62, 66, 72–73. So the ALJ's step four finding that Kohler could perform the credit authorizer job *as actually performed* is supported by substantial evidence. *See* 20 C.F.R. § 416.960(b)(2) ("Determining whether you can do your past relevant work …. a vocational expert … may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment[s] can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy.").

### 5.   *The ALJ did not violate Social Security Ruling 16-3p*

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ considers medical evidence, the claimant's statements, other information provided by medical sources, and any other relevant evidence in the record. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *4 (Oct. 25, 2017); 20 C.F.R. §§ 404.1529, 416.929. Other relevant evidence includes: daily activities; the location, duration, frequency, and intensity of pain or symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication; treatment, other than medication, to relieve pain; any measures used to relieve pain; and "[o]ther factors concerning … functional limitations and restrictions due to pain or other symptoms." 20 C.F.R. § 404.1529(c). "The ALJ need not analyze all seven

factors, but should show that he considered the relevant evidence." *Hatcher v. Berryhill*, No. 1:18-cv-1123, 2019 WL 1382288, at *15 (N.D. Ohio Mar. 27, 2019) (citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005)).

Kohler argues that the ALJ failed to consider Kohler's pain, as Social Security Ruling 16-3p requires, and "the residual effects of Kohler's numerous impairments." Doc. 9, at 14, 20. But the ALJ considered Kohler's symptoms, including pain. Tr. 18–19. The ALJ cited the relevant regulation, 20 C.F.R. § 416.929(c)(3), and Social Security Ruling 16-3p, and listed the factors used to evaluate symptoms. Tr. 18. So Kohler's argument that ALJ failed to consider her symptoms is belied by the record.

Next, Kohler recites evidence in the record and concludes, "[t]he record, therefore, established that Kohler had pain which interfered with her ability to perform household chores and/or her activities of daily living." Doc. 9, at 17. But the ALJ found that Kohler's daily activities were inconsistent with Kohler's allegations of disabling symptoms and limitations. Tr. 19. Kohler disagrees with the ALJ's finding, Doc. 9, at 18, but doesn't explain how it is erroneous. Moreover, the ALJ also relied on the objective medical evidence in discounting Kohler's allegations of disabling symptoms. Tr. 19. The ALJ explained that, over time, Kohler consistently had normal exam findings and she did well on her medications. Tr. 19–20. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *5, 8 (the ALJ considers objective medical evidence and the

effectiveness of medications). And the ALJ relied on the state agency reviewers' opinions, Tr. 20, a finding that Kohler also does not challenge. *See* Soc. Sec. Ruling 16-3p, 2017 WL 5180304, at *7 (the ALJ considers the state agency medical consultants' opinions when evaluating the claimant's symptoms).

Kohler argues that the ALJ failed "to properly consider Kohler's disabling pain and the fact that it would likely result in [Kohler's] inability to sustain attention and concentration." Doc. 9, at 17–18. But Kohler doesn't cite any evidence in the record showing that her pain interfered with her concentration. The fact that the ALJ didn't discuss something that didn't exist is not grounds for reversal.

Kohler complains that the ALJ didn't discuss "any limitations with Kohler's hands or symptoms related to her headaches." *Id.*, at 18–19. But Kohler only cites one treatment note in the record in which Kohler reported headaches, *id.* at 19 (citing Tr. 926), and no evidence about "symptoms related to [Kohler's] headaches" or how those symptoms were disabling. Not mentioning one document, particularly in a nearly 3000-page record, is not error. *See, e.g., Dickey-Williams v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 792, 807 (E.D. Mich. 2013) ("[T]he fact an ALJ did not specifically state every piece of evidence or every symptom is not an error"). As for Kohler's hands, Kohler likewise doesn't cite evidence showing what limitations she had. In fact, the record Kohler cites shows that Kohler reported "some pain and stiffness in hands however the functionality is much better." Tr. 2472, Doc. 9, at 18. And

at subsequent rheumatology visits, the doctor assessed Kohler's symptoms, including her hands, as improved with medication, Tr. 2459, 2463, 2469.

On the last page of her brief, Kohler tosses out canned language—the ALJ "failed to support her conclusions with substantial evidence" and "the ALJ did not build an accurate and logical bridge between the evidence documenting Kohler's disabling problems as set forth in the record," Doc. 9, at 20—which is unaccompanied by any effort to develop a related argument. So those purported arguments are waived. *McPherson*, 125 F.3d at 995–96.

### Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: April 17, 2023

    */s/ James E. Grimes Jr.*
    James E. Grimes Jr.
    U.S. Magistrate Judge

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019).